| | |
|---|---|
| **VC MANAGEMENT, LLC, a Delaware**<br>**Limited Liability Company,**<br><br>Plaintiff,<br><br>v.<br><br>**RELIASTAR LIFE INSURANCE**<br>**COMPANY,**<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   No.  **14 C 1385**<br>)<br>)   **Judge Rebecca R. Pallmeyer**<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

Vestor Capital Partners, LLC ("Vestor") had insured the life of its president, Brian Baker, for $5 million. But in October 2012, Vestor submitted paperwork to reduce the amount of the policy to $2 million. Just after Vestor submitted the necessary forms—but before the insurer, Defendant ReliaStar Life Insurance Company ("ReliaStar") had signed them—Baker died unexpectedly. ReliaStar has tendered $2 million in life insurance proceeds to Plaintiff Vestor Capital Management, LLC ("VCM"), Vestor's successor. VCM contends in this lawsuit that Baker died before ReliaStar approved the policy reduction, and that ReliaStar is on the hook for the full $5 million. Both sides have moved for summary judgment, and the facts are largely undisputed. Although both parties make compelling arguments, the court is persuaded that Vestor made an offer by submitting the relevant policy-change form and ReliaStar failed to accept that offer before Baker's death. VCM's motion is granted, ReliaStar's motion is denied, and ReliaStar's motion to strike the declarations of two VCM witnesses is denied, as well.

## BACKGROUND

On or about October 13, 2010, Plaintiff's predecessor, Vestor, applied for a life insurance policy with ReliaStar to insure the life of its president and majority shareholder, Brian Baker, in the amount of $5 million for a term of 39 years. (Joint Stip. [92] ¶ 7; Policy, Joint Stip. Ex. A at 3.) The purpose of the policy was to ensure that, in the event of Baker's premature

death, there would be money available to satisfy any obligations that Vestor had to Baker's estate. (Def. LR 56.1 Stmt. [98], Ex. 2 John Baker Dep. at 46.) Vestor was both the owner and the intended beneficiary of the policy. (Joint Stip. ¶ 7.)

After determining that Baker was eligible for coverage, on December 17, 2010, ReliaStar issued the life insurance policy (#AD20348111) (the "Policy") with a policy date of December 15, 2010. (*Id.* ¶ 10.) Under the Policy, Vestor was required to pay ReliaStar an annual premium of $16,098, a figure calculated based on the Policy's face amount ($5 million) and term (39 years). (Policy at 3.) "Death Proceeds" under the Policy are defined as the amount payable to the beneficiary upon the death of the insured, and are equal to the face amount of the Policy, adjusted for any excess or unpaid premium. (Joint Stip. ¶ 13 (quoting Policy at 6).) The Policy contains no provision relating specifically to decreases in the face amount of the Policy, but it contains the following general provision relating to Policy changes:

> Both our President or another officer, and our Secretary or Assistant Secretary, must sign all changes to your policy. No other person can change any of your policy's terms and conditions.

(*Id.* ¶¶ 17-18 (quoting Policy at 7).)

In October 2012, Vestor sold substantially all of its assets to Vestor Capital, LLC ("Vestor Capital"). (*Id.* ¶ 5; Def. LR 56.1 Stmt. ¶ 5.) Following the sale, Baker remained the president of Vestor, but the company ceased to operate as a going concern, and Vestor determined that it no longer had a business need for $5 million in insurance coverage on Baker's life. (Joint Stip. ¶ 15; Def. LR 56.1 Stmt. ¶ 5, 14-15.) As a result, Vestor began to consider reducing the amount of the Policy. (*Id.*) Vestor also began to consider changing the beneficiary and owner of the Policy to VCM—a company formed by Vestor's members in 2012 to replace Vestor following the company's asset sale. (*Id.*)

On October 16, 2012, Vestor's insurance agent, John Baker ("John"),[1] called ReliaStar's customer service center to inquire about possible changes to the Policy, including a decrease in the Policy's face amount.  (Joint Stip. ¶ 19.)  John spoke with a ReliaStar customer service representative, Arianna Heitman, who assured him that ReliaStar "certainly" could do a "one-time" face decrease, and explained that, in order to make this change, the Policy "just needs to meet the minimum requirements."  (Joint Stip., Ex. B. at 5.)  She noted just one restriction: that ReliaStar would not permit a face decrease that would reduce a policy to below $100,000.  (*Id.* at 6.)  John asked how Vestor's premiums would be determined if Vestor were to reduce the face amount of the Policy to $2.5 million or $1 million.  (*Id.* at 8.)  Heitman responded that she would do the calculations and provide, by e-mail, quotes for policies with these face amounts, along with a "Request for Policy Service Form," a form used for making changes to a ReliaStar policy.  (*Id.* at 8-9; Pl. LR 56.1 Stmt. [93] ¶ 3.)  On October 23, 2012, Heather Phelps ("Phelps"), an employee of Cognizant Technology Solutions U.S. Corporation ("Cognizant") working on behalf of ReliaStar,[2] sent an e-mail to John containing premium quotes for policies with face amounts of $2.5 million and $1 million, along with a blank Policy Service Request Form.  (Joint Stip. ¶ 22, Ex. D.)  In her e-mail, Phelps stated, "[i]f you wish to decrease the face amount of the Policy, the attached Policy Service Request Form can be completed and either mailed to: ING Service Center, PO Box 5011, Minot, ND 58702-5011, or faxed to the ING Service Center at 877-373-2090."  (*Id.* ¶ 23, Ex. D.)

On or about November 20, 2012, Brian Baker informed John Baker that Vestor wished to decrease the face amount of the Policy from $5 million to $2 million and to change the owner

---

[1]     John Baker is Brian Baker's brother, but has no role in Vestor's business other than as its insurance agent.

[2]     On June 5, 2012, ReliaStar's parent company ING North America Insurance Company ("ING") and Cognizant entered into a Master Services Agreement, pursuant to which Cognizant performed certain customer service and administrative services relating to insurance policies issued by ReliaStar.   (Joint Stip. ¶ 38.)

and beneficiary of the Policy from Vestor to VCM. (Pl. LR 56.1 Stmt. ¶ 21, Baker Decl. ¶ 13.) That same day, John placed a telephone call to ReliaStar's customer service center to obtain additional information about these changes and spoke with Alisha Evans ("Evans"), a ReliaStar customer service representative. (Pl. LR 56.1 Stmt. ¶ 25.) When John told Evans about Vestor's plans to reduce the Policy from $5 million to $2 million, Evans responded, "that will be perfectly fine." (Joint Stip., Ex. E at 4-5.) John then inquired about the timing of the changes, noting the Policy's December 15, 2012 renewal date. (*Id.*) Evans told John that it would take ReliaStar approximately 20 business days to process the face decrease, but that in order to avoid delay, she could place a "rush request" on the face decrease to ensure that the change went into effect by December 15, 2012. (*Id.* at 7.) Later that day, John placed a second call to ReliaStar and spoke with ReliaStar customer service representative Amanda Smith ("Smith"); during this second phone call, Smith told John that ReliaStar could not process the face decrease during the Policy's 31-day "grace period" commencing on December 16, 2012, which would mean that the face decrease for the Policy would need to go into effect before that date.[3] (Joint Stip. ¶ 27, Ex. F.)

On November 27, 2012, Vestor faxed a completed Policy Service Request Form to ReliaStar. (Joint Stip. ¶ 31.) Under Section G of the form, "Change Existing Coverage," Vestor checked the box for "Decrease Face Amount To" and wrote "$2,000,000." (Joint Stip., Ex. G at 4.) Brian Baker had signed the form on November 21, 2012. (*Id.*) Above the signature line and Baker's signature, the form states as follows:

> All who sign agree that no change will be made unless the policy is eligible for the change requested according to its terms or under our rules and until we are satisfied that, as of the date of this request, all insureds and proposed insureds are eligible for the requested coverage.

---

[3]     The "grace period" of an insurance policy is a period of time after the premium due date in which a policyholder is able to make a premium payment without the insurance policy coverage lapsing. (*See* Policy at 9.)

(*Id.* at 2.)  In a box labelled "ING Customer Service Center Use Only," the form contains a place for signature by ReliaStar.  (*Id.*)  There is no place on the form for a policyholder to designate the effective date for the requested change, and the completed form in this case did not refer to a date on which the face decrease would become effective.

At the time Vestor submitted the Policy Service Request Form, ReliaStar had various internal policies and procedures concerning ReliaStar term life products, including the Policy.[4] (Joint Stip. ¶ 34.)  One internal document, entitled "Term Life Product Matrix," states that face decreases to term life insurance policies are a permitted "Post-Issue change" and provides that "[r]equested face amount decreases . . . will be allowed by company practice (not contractually guaranteed)."  (*Id.* ¶ 36, Ex. H at 11.)  ReliaStar also had an internal policy that a Policy Service Request Form must be signed by an officer of ReliaStar or ReliaStar's parent company, ING. (*Id.* ¶ 39.)  The process for obtaining required officer signatures is described in a ReliaStar document entitled "Routing Process for ING Forms that need officer signature."  (*Id.* ¶ 41.)  It is undisputed that one reason that ReliaStar's internal policy requires an officer signature on a Policy Service Request Form is that the endorsed form is a contractual document that will be attached to, and become part of, the insurance policy.  (Def. Resp. to Pl. LR 56.1 Stmt. [104] ¶ 10.)  ReliaStar also requires an officer signature on the form so that both the policyholder and ReliaStar have a record of the form being processed.  (Def. Add. LR 56.1 Stmt. [104] ¶ 6.)

On December 3, 2012, Heather Phelps began processing Vestor's Policy Service Request Form in accordance with ReliaStar's internal procedures.  (Joint Stip. ¶ 46.)  First, Phelps conducted an "in good order review" to confirm that the completed Policy Service Request Form met ReliaStar's guidelines for face amount reductions, which permit a face decrease so long as the policy: (a) has not been issued within the past year; (b) has not

_____

[4]        None of these guidelines or procedures were referenced in or attached to the Policy, and the parties do not dispute that Vestor was unaware of these guidelines and procedures when it submitted the Policy Service Request Form to ReliaStar.  (*Id.*)

undergone a face amount decrease in the past; (c) would have a face amount of at least $100,000 after the decrease; and (d) is in "Active" status.[5]  (*Id.* ¶ 45.)  After completing the "in good order review," Phelps entered the effective date of the face decrease as December 15, 2012, and, in accordance with ReliaStar's procedures, she "pended" the Policy Service Request Form for further processing on December 15, 2012, the Policy renewal date.  (*Id.* ¶ 46.)

Phelps's next step took place on Saturday, December 15, 2012.  (*Id.* ¶ 48.)  Phelps was not authorized to sign or endorse the Policy Service Request Form, however, and because ReliaStar's offices are closed on Saturday, she was unable to send the form to ReliaStar for the required ReliaStar officer signature.  (*Id.* ¶¶ 50, 58.)  Nonetheless, ReliaStar's internal procedures require confirmation letters for face decreases to be drafted on and dated with the policy's "Monthiversary date"[6]; accordingly, Phelps prepared a draft confirmation letter to Vestor dated December 15, 2012.  (*Id.* ¶ 50, Ex. K.)  She then placed an "X" across the face of the letter to indicate that it was not sent out.  (*Id.*)  In her notes from that day, Phelps wrote the following:

> Face Decrease processed from $5m to $2m, effective 12/15/2012.  The new premium is $6,498.00. . . .  Confirmation letter mailed.  Form has been endorsed.

(*Id.* ¶ 52.)  Phelps's notes, however, were inaccurate in two respects: the confirmation letter had not yet been mailed, and the Policy Service Request Form had not yet been endorsed.  (*Id.*)  It is undisputed that Phelps lacked authority to make changes to the Policy's terms and that a request to reduce the face amount of a life insurance policy is a request to change a term of the Policy.  (*Id.* ¶ 61; Def. Resp. to Pl. LR 56.1 Stmt. ¶ 4.)  It is further undisputed that Phelps lacked final authority to approve and process face decreases that did not meet the criteria set forth in

---

[5]     Although ReliaStar's procedures do not define "Active" status, the court presumes that an active policy is one that has not lapsed due to past-due premium payments.

[6]     The "monthiversary" date, according to ReliaStar's internal procedures, is the same day of the month as the Policy's effective date.  (Joint Stip., Ex. K.)  Accordingly, the monthiversary of Baker's Policy, effective December 15, 2012, would occur on the 15th of each month.

ReliaStar's internal guidelines. (Def. Add. LR 56.1 Stmt. ¶ 2.) ReliaStar nevertheless contends that Phelps did have authority to approve and process the face decrease in this case because the face decrease did, in fact, meet the criteria set forth in ReliaStar's guidelines. (*Id.*; Def. LR 56.1 Stmt. ¶ 42.)

The following day, December 16, 2012, Brian Baker died unexpectedly. (Joint Stip. ¶ 11; Feb. 3, 2016 Tr. [111] at 7.) On December 17, 2012, the day after Baker's death, William McNulty ("McNulty"), the Treasurer and a member of Vestor, called ReliaStar's customer service center on two separate occasions to request information about the status of the Policy. (Joint Stip. ¶ 65.) During these calls, McNulty did not tell ReliaStar that Baker had died.[7] (*Id.*) McNulty first spoke with ReliaStar customer service representative Lanette Miller ("Miller"), who informed McNulty that the Policy face decrease had been completed. (*Id.* ¶ 66, Ex. O at 5-6.) Miller determined that the face decrease had been completed based on the company's data page for the Policy, which showed a face amount of $2 million, as well as Phelps's December 15 notes, which stated that the face decrease had been processed and that a confirmation letter had been mailed out. (Miller Dep. [91-12] at 23-29.) McNulty also asked Miller if, going forward, Vestor could pay a monthly, as opposed to annual, premium on the Policy. (*Id.*) Miller responded that Vestor would need to send ReliaStar a letter requesting monthly billing. (*Id.*)

McNulty next spoke with ReliaStar customer service representative Michelle Teran ("Teran") who, like Miller, informed McNulty that ReliaStar had completed the face decrease and that a confirmation letter had been sent out on December 15. (Joint Stip., Ex. P at 6-7.) McNulty asked whether it would be possible to get the face decrease reversed, and after putting McNulty on hold, Teran called ING administrative services to see whether reversal was possible. (*Id.* at 7.) ING administrative services staff asked Teran when the face decrease had

---

[7]     VCM acknowledges that McNulty did not disclose Baker's death to ReliaStar on December 17, 2012 because he had not yet received a confirmation from ReliaStar that it had completed the face decrease and he was concerned that ReliaStar might backdate its documentation if he disclosed Baker's death. (Pl. LR 56.1 Stmt. ¶ 35 (citing McNulty Decl. ¶ 13).)

been completed, and she reported that the confirmation letter was sent out on December 15. (*Id.* at 8-9.) Based on this information, ING informed Teran that the Policy's face decrease could not be reversed. (*Id.* at 9-11.) Teran then relayed this message to McNulty. (*Id.*)

Though both of ReliaStar's representatives reported that the face decrease had already been completed, McNulty suspected that the face decrease had not been completed before Baker's death because, as of December 17, 2012, Vestor had received nothing in writing from ReliaStar confirming the face amount reduction. (Pl. LR 56.1 Stmt. ¶ 32 (citing McNulty Decl. ¶ 10).) Based on his belief that the face amount of the Policy remained $5 million on the date of Baker's death, on December 17, 2012, McNulty signed a check from VCM—the new owner and beneficiary of the Policy—to ReliaStar for $1,408.58, the monthly premium due on the original $5 million Policy. (Joint Stip. ¶ 70, Ex. Q.)

On December 18, 2012, two days after Baker's death, Phelps sent the Policy Service Request Form to ReliaStar for the required officer signature. (*Id* ¶ 54.) That same day, pursuant to ReliaStar's internal procedures, Brandi Barnard ("Barnard"), an ING Service Manager and Phelps's supervisor, reviewed the Policy Service Request Form, endorsed it with the signature stamp of ReliaStar officer Laurie Rasamen on the designated signature line, and wrote December 18, 2012 on the date line beside the signature stamp. (*Id.* ¶ 55; Barnard Dep. [98-7] at 88.) According to Barnard, although she would not stamp a form that contained incorrect information, the purpose of her review was not to confirm that the information contained on the Policy Service Request Form was accurate. (Barnard Dep. at 88-90.) Rather, the purpose of the review, according to Barnard, was simply to ensure that the form contained two pages and that the policy number matched the cover sheet. (*Id.*) Barnard then returned the endorsed Policy Service Request Form to Phelps so that Phelps could prepare and send a confirmation letter to Vestor. (*Id.*)

After receiving the endorsed form, Phelps prepared a confirmation letter dated December 18, 2012, and delivered the letter, along with a copy of the endorsed form, to

8

ReliaStar's mail department for mailing to Vestor. (Joint Stip. ¶ 56.) ReliaStar mailed the confirmation letter and endorsed form to Vestor on December 19, 2012, and Vestor received the form some time between December 19, 2012 and December 25, 2012. (*Id.* ¶ 57.) The letter states, in pertinent part:

> As you requested, we decreased the face amount of your policy from $5,000,000.00 to $2,000,000.00, effective 12/15/2012. Your new annual premium is $6,498.00.

(*Id.* ¶ 56, Ex. N.)

Also, on or around December 18, 2012, ReliaStar mailed Vestor a premium notice for the Policy, stating that Vestor's annual premium of $6,498, based on a $2 million policy, was due by January 20, 2013. (*Id.* ¶ 71, Ex. R.) Vestor did not respond to this notice, and did not notify ReliaStar of any disagreement with the annual premium reflected therein. (*Id.* ¶ 72.) Based on McNulty's December 17, 2012 request to pay a monthly, as opposed to annual, premium on the Policy, ReliaStar mailed Vestor a second premium notice on December 24, 2012, setting the monthly premium at $617.31, based on a $2 million policy, due by January 20, 2013. (*Id.* ¶ 73, Ex. S.) On receiving this second notice, Vestor again made no response or objection to the monthly premium amount. (*Id.* ¶ 73.)

On December 26, 2012, ReliaStar mailed Vestor a refund in the amount of $173.96, the difference between the amount of the monthly premium VCM had paid on December 17, 2012 ($1,408.58) for the $5 million policy and two months of premiums ($617.31 per month) payable on a $2 million policy. (*Id.* ¶ 74, Ex. T.) By letter dated January 2, 2013, McNulty, writing on behalf of VCM, returned the $173.96 refund to ReliaStar, explaining that he was returning the refund because ReliaStar had issued the check to Vestor, the previous policyholder, instead of VCM, the current policyholder, and asking that ReliaStar reissue the refund to VCM. (*Id.* ¶ 75, Ex. U.) In his letter, McNulty voiced no objection to the refund or ReliaStar's premium calculations. On January 10, 2013, McNulty, again writing on behalf of VCM, sent ReliaStar another letter, along with a $400 check for "payment of any balance due on the first month's

premium for the . . . Policy [with] the face amount of $5 million."[8]  (Def. Resp. to Pl. LR 56.1 Stmt. ¶ 41; McNulty Decl., Ex. D.)

On February 5, 2013, McNulty notified ReliaStar of Baker's death and requested a claim form to collect death benefits under the Policy.  (Joint Stip. ¶ 79; Pl. LR 56.1 Stmt. ¶ 43.) ReliaStar e-mailed the claim form to VCM on February 12, 2013, and in an e-mail dated March 5, 2013, ReliaStar confirmed that it would pay VCM's claim for death benefits under the Policy.  (Pl. LR 56.1 Stmt. ¶ 26; Baker Decl., Ex. D.)  Upon receipt of this notification, VCM informed ReliaStar that it expected to receive a $5 million death benefit, as ReliaStar had not accepted the requested face decrease prior to Baker's death.  (*Id.* ¶ 27, Baker Decl., Ex. E.)  On or about April 9, 2013, ReliaStar mailed VCM a letter, enclosing a check for $2,054,973.46, which represented payment of a $2 million death benefit under a $2 million policy, plus interest and a refund of the $400 premium that McNulty had sent to ReliaStar on January 10, 2013. (Joint Stip. ¶ 82; Baker Decl., Ex. F.)  ReliaStar denied VCM's claim for payment of a $5 million death benefit, explaining that it had "made the requested face decrease on December 15, 2012 with an effective date of December 15, 2012." (*Id.*)  "Accordingly," wrote ReliaStar, "at the time of [Baker's] death on December 16, 2012, the face amount of the Policy was $2 million." (*Id.*) On May 30, 2013, ReliaStar sent a letter to VCM acknowledging that VCM could negotiate the $2,054,973.46 check without waiving its right to dispute the amount due under the Policy. (Baker Decl., Ex. H.)  VCM's action seeking $3 million in allegedly unpaid death benefits followed.

## DISCUSSION

As noted, the facts are essentially undisputed, and both sides seek summary judgment. VCM asserts that the requested face decrease did not go into effect before Baker's death and that ReliaStar's refusal to pay VCM the entire $5 million death benefit constitutes a breach of

---

[8]     VCM does not explain why it believed that an additional $400 was due under the $5 million policy for the first month when it already had paid the full monthly premium ($1,408.58) payable for the $5 million policy minus the refund amount of $173.96.

the Policy agreement. (Pl. Mem. [97] at 1-2.) VCM contends that ReliaStar did not approve Vestor's request to reduce the face amount of the Policy from $5 million to $2 million until December 18, 2012, when Barnard reviewed and approved the Policy Service Request Form and stamped it with the required ReliaStar officer signature. (*Id.* at 14.) Because its right to receive death benefits under the Policy became fixed on December 16, 2012, when Baker died, VCM asserts that it is entitled to receive the full $5 million death benefit that was in effect on that date. (*Id.*)

In its own motion, ReliaStar asserts that there was no breach because the parties agreed to decrease the face amount of the Policy from $5 million to $2 million as early as November 27, 2012, when Vestor submitted the Policy Service Request Form to ReliaStar (Def. Mem. [95] at 14), or no later than December 15, 2012, when Heather Phelps finished processing the face decrease. (*Id.* at 19.) Under either scenario, ReliaStar contends, by the time of Baker's death on December 16, 2012, the parties had agreed upon a face decrease effective December 15, 2012. (*Id.* at 14, 19.) Having paid the full amount of the $2 million policy in effect at the time of Baker's death, ReliaStar asserts that it has no further liability to VCM. (*Id.* at 15.) Even if the face decrease did not become effective prior to Baker's death, moreover, ReliaStar raises the following affirmative defenses, which, according to ReliaStar, preclude VCM from recovering the full $5 million: VCM ratified the face decrease, VCM waived any claim that the face decrease was not effective, VCM is estopped from claiming that the face decrease was not effective, and VCM breached its duty of good faith and fair dealing.[9] (*Id.*

---

[9]     In addition to its summary judgment motion, ReliaStar has filed a motion to strike portions of the declarations of VCM members John Baker and William McNulty, filed as exhibits to VCM's motion for summary judgment. [105] As the court reads the contested paragraphs, they do not contain any new factual information material to the parties' dispute. Instead, they contain mostly information that would not be admissible at trial, such as legal conclusions about the Policy language (Baker Decl. ¶ 6, McNulty Decl. ¶ 3 ("The Baker Policy did not give Vestor a unilateral right or option to decrease the face amount"), and opinions regarding the consistency of ReliaStar's communications to VCM (Baker Decl. ¶ 21, McNulty Decl. ¶ 11 ("This [assertion/information] was inconsistent . . . .").) *See Einstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (on summary judgment, the court may only consider evidence that would be

at 24-32.)

## I.     Summary Judgment Standard

Summary judgment is proper if "there is no genuine issue as to any material fact," such that "the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *J.S. Sweet Co., Inc. v. Sika Chem. Corp.*, 400 F.3d 1028, 1032 (7th Cir. 2005). On cross-motions for summary judgment, the standard is the same as that for individual motions for summary judgment. *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). Each party must establish that no issues of material fact exist, and the court will "construe all inferences in favor of the party against whom the motion . . . was made." *Employers Mut. Cas. Co. v. Skoutaris*, 453 F.3d 915, 923 (7th Cir. 2006) (citing *Huntzinger v. Hastings Mut. Ins. Co.*, 143 F.3d 302, 307 (7th Cir. 1998)).

## II.    VCM's Breach of Contract Claim

To establish a breach of contract under Illinois law, a plaintiff must prove: (1) that a valid and enforceable contract exists; (2) that the plaintiff has substantially performed; (3) that the defendant has committed a breach; and (4) resulting damages. *See Reger Dev., L.L.C. v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010). It is undisputed that, at the time of Baker's death, a contract existed between ReliaStar and Vestor in the form of a life insurance policy, which Vestor had substantially performed; the parties' dispute concerns whether ReliaStar and Vestor entered into an enforceable agreement to modify that contract by decreasing the face amount of the policy from $5 million to $2 million prior to Baker's death.

"[M]odification of a contract is a change in one or more respects that introduces new elements into the details of the contract and cancels others, but leaves the general purpose and effect undisturbed." *Nebel, Inc. v. Mid-City Nat'l Bank of Chicago,* 329 Ill. App. 3d 957, 964, 769 N.E.2d 45, 51-52 (Ill. App. Ct. 1st Dist. 2002). Under Illinois law, a valid modification of a

---

admissible at trial). The court has not considered these paragraphs in granting VCM's motion for summary judgment, however, and ReliaStar's motion to strike is denied as moot.

contract "must satisfy all criteria essential for a valid contract, including offer, acceptance, and consideration."[10]  *Id.*; *see Gorman Publishing Co. v. Stillman*, 516 F. Supp. 98, 108 (N.D. Ill. 1980) ("A modification of a contract is itself a contract and, as such, is only enforceable where the ordinary standards of contract law are satisfied.")  Whether the evidence is sufficient to establish the existence of the elements required to form a contract is generally a question "to be determined by the trier of fact." *Prignano v. Prignano*, 405 Ill. App. 3d 801, 810, N.E.2d 89, 100 (Ill. App. Ct. 2d Dist. 2010).  But "if the facts are undisputed and there can be no [difference in reasonable judgment] as to the inferences to be drawn from them," then the question of contract formation becomes a question of law. *Yorke v. B.F. Goodrich Co.*, 130 Ill. App. 3d 220, 223, 474 N.E.2d 20, 22 (Ill. App. Ct. 2d Dist. 1985).  In this case, the facts are undisputed, and the court finds, as a matter of law, that there was no enforceable agreement to decrease the face amount of the Policy prior to Baker's death.

### A.    Offer

"The test for an offer is whether it induces a reasonable belief in the recipient that he can, by accepting, bind the [offeror]." *Architectural Metal Sys., Inc. v. Consol. Sys., Inc.*, 58 F.3d 1227, 1229 (7th Cir. 1995) (citing *McCarty v. Verson Allsteel Press Co.*, 89 Ill. App. 3d 498, 507, 411 N.E.2d 936, 943 (Ill. App. Ct. 1st Dist. 1980)).  In other words, an "offer existed if the purported offeree 'reasonably [could] have supposed that by acting in accordance with it a contract could be concluded.'" *Wigod v. Wells Fargo Bank, N.G.*, 673 F.3d 547 (7th Cir. 2012) (quoting SAMUEL WILLISTON, WILLISTON ON CONTRACTS § 4.10 (4th ed. 2011) (hereinafter "WILLISTON ON CONTRACTS")).  Defendant asserts that it was ReliaStar who extended offer to decrease the face amount of the Policy when, after having told Vestor that the Policy was eligible for a face decrease, ReliaStar sent Vestor a blank Policy Service Request Form on November 20, 2012.  (Def. Mem. at 15-17.)  VCM disagrees that the blank Policy Service

---

[10]    The parties agree that Illinois law governs VCM's breach of contract claim.  (Def. Mem. at 15; Pl. Mem. at 4.)

Request Form was an offer. (Pl. Mem. at 6.) Instead, VCM asserts that it was Vestor that made an offer to decrease the face amount of the Policy on November 27, 2012 when it submitted the completed Policy Service Request Form to ReliaStar with Baker's signature. (*Id.*)

The circumstances can be construed in different ways, but the court agrees with VCM that the blank Policy Service Request Form was not an offer because ReliaStar's approval of the completed form was required before the change would be effective. It is undisputed that Vestor had no unilateral right to decrease the amount of the Policy without ReliaStar's approval, and the Policy Service Request Form expressly provided that "no [face decrease] will be made unless the policy is eligible for the change requested according to its terms and under [ReliaStar's] rules and until [ReliaStar is] satisfied that, as of the date of this request, [the insured] is eligible for the requested coverage." That language conditions the face decrease on future action by ReliaStar, and confirms that ReliaStar did not intend to be bound by the face decrease until it had approved the request. *See Wigod*, 673 F.3d at 561 ("[W]hen the promisor conditions a promise on his own future action or approval, there is no binding offer." (emphasis omitted)); *see also McCarty*, 89 Ill. App. 3d 498, 411 N.E.2d at 943 ("So long as it is reasonably apparent that some further act of the offeror is necessary, the offeree has no power to create contractual relations by an act of his own, and there is not yet an operative offer." (internal citation and quotations omitted)). *Compare Lutwak v. Mutual Life Ins. Co. of N.Y.*, No. 85 C 7139, 1986 WL 3602, *1-2 (N.D. Ill. Mar. 18, 1986) (policy surrender form was submitted prior to the policy owner's death, but not processed until after the death; surrender was effective because the policy owner had a unilateral right to surrender, and no language in the policy or surrender form required receipt by the home office before surrender was effective).

ReliaStar suggests that the language on the Policy Service Request Form requiring ReliaStar's approval is not controlling because face decreases are "allowed by company practice" so long as they satisfy certain criteria, which were satisfied in this case. (Def. Mem. at 16.) The fact that Vestor's requested face decrease was "allowed by company practice" under

14

ReliaStar's internal rules, however, was never communicated to Vestor, and thus has little relevance to the court's analysis of VCM's breach of contract claim. *See Laserage Tech. Corp. v. Laserage Lab., Inc.*, 972 F.2d 799, 802 (7th Cir. 1992) (In assessing the parties' intent, "'secret hopes and wishes count for nothing' because 'the status of a document as a contract depends on what the parties express to each other and the world, not on what they keep to themselves.'" (quoting *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814-15 (7th Cir. 1987))). Perhaps recognizing that its internal rules have no significance unless they were communicated to Vestor, ReliaStar asserts that, based on Vestor's phone conversations with ReliaStar customer service representatives in October 2012 and November 2012, Vestor was aware that ReliaStar's internal rules authorized the $2 million face decrease before Vestor submitted the Policy Service Request Form. During one of these phone calls, ReliaStar customer service representative Arianna Heitman informed Vestor that a face decrease could not reduce an insurance policy to below $100,000 and that it was a "one-time" option, *i.e.*, could only occur once during the life of the policy. (Def. Resp. [103] at 4.) In a subsequent phone call, Vestor told ReliaStar customer service representative Alisha Evans of its plan to decrease the face amount of the Policy, and she responded that a $2 million decrease "would be perfectly fine." (*Id.*) After these phone conversations, ReliaStar notes, it e-mailed the Policy Service Request Form to Vestor, along with premium quotes for policies with different face values, and instructed Vestor as follows: "if you wish to decrease the face amount of the policy, the attached [form] can be completed." (*Id.* at 1.)

ReliaStar's communications were encouraging, but they fall short of an offer: They did not put Vestor on notice that the face decrease satisfied all of ReliaStar's internal criteria, without the need for any further approval by the insurance company. Heitman explained that any face decrease could not bring the policy below $100,000 and could only be performed once during the lifetime of the policy. That statement is a description of the criteria by which ReliaStar evaluates face decreases and was, therefore, an invitation for Vestor to make an offer

in accordance with those criteria. In turn, once Vestor submitted the Policy Service Request Form, ReliaStar's acceptance of that form constituted a commitment to consider Vestor's request for a Policy face decrease in accordance with the criteria mentioned by Heitman. Acceptance of the form was not an agreement to approve the decrease. *Cf. Steinberg v. Chicago Med. School*, 69 Ill.2d 320, 327, 371 N.E.2d 634, 638 (Ill. 1977) (submission of application for admission to medical school was an offer; defendant school's acceptance of the application constituted a commitment to consider the application under criteria set forth in school's brochure—not to admit the student).

Moreover, contrary to ReliaStar's assertion, ReliaStar's customer service representatives did not make assurances that Vestor's application for a decrease in the face amount of its Policy satisfied *all* of ReliaStar's criteria. Instead, Heitman advised that the face decrease request needed to meet "the minimum requirements," without any specific description of what these requirements were. Nor did Heitman suggest that Vestor's application could not be denied. Instead, his statement that the face decrease must meet certain "minimum requirements" confirms the terms of the Policy Service Request Form, that ReliaStar's approval was required before the face decrease could be effective.

Nor does the court understand Evans's statement that the face decrease "would be perfectly fine" as tantamount to a confirmation that ReliaStar had determined that the Policy was eligible for the $2 million face decrease without the need for any further approval. Evans's oral statement was not enough to override the plain language of the Policy Service Request Form, which provides, in pertinent part, that no change will be made until ReliaStar is "satisfied that, *as of the date of this request*, [the insured is] eligible for the requested coverage." (Ex. G to Joint Stip. at 2 (emphasis added).)[11] Based on the Form's plain language, the face decrease could

---

[11] ReliaStar asserts that this language does not refer to a policy's eligibility for a face decrease, but rather, refers to the insured's eligibility for insurance coverage of any kind. (Def. Mem. at 16 n.3.) The language of the form, however, states "requested coverage," not "insurance coverage," and it is undisputed that the coverage being "requested" in this case was

16

not be approved by ReliaStar prior to Vestor's submission of the Policy Service Request Form on November 27, 2012.  This order of operations suggests that Vestor, not ReliaStar, made the offer here.  The court reaches a similar conclusion with respect to ReliaStar's e-mail direction that Vestor should complete the Policy Service Request Form if it "wish[ed] to decrease the face amount of the policy."  As the court reads this e-mail, it is an instruction concerning the form to be used to request a face decrease, which ReliaStar could then decide to accept or reject, depending on whether the request satisfied ReliaStar's requirements.  With respect to the premium quotes sent by ReliaStar to Vestor, price quotations are generally considered to be "mere invitations to enter into negotiations or submit offers."  *Ace American Ins. Co. v. Wendt, LLP*, 724 F.Supp.2d 899, 902 (N.D. Ill. 2010) (quoting *Rush-Presbyterian-St. Luke's Med. Ctr. v. Gould, Inc.*, No. 93 C 1661, 1995 WL 340967, at *5 (N.D. Ill. June 2, 1995)).

In sum, the premium quotations, as well as other communications between ReliaStar and Vestor, may have been invitations by ReliaStar for Vestor to submit an offer.  But the request to modify the insurance agreement to decrease the amount of the Policy was initiated by Vestor on November 27, 2012, when Vestor submitted the Policy Service Request Form, containing the amount of the face decrease and Baker's signature.  *See Western Fire. Ins. Co. v. Moss*, 11 Ill. App. 3d 802, 813, 298 N.E.2d 304, 313 (Ill. App. Ct. 1st Dist. 1973) (an offer must be communicated to the offeree).  At this point, it was clear to both ReliaStar and Vestor that, by submitting the Policy Service Request Form, Vestor was seeking a face decrease, but ReliaStar's approval was required in order to complete the contract modification.

## B.  Acceptance

Having concluded that Vestor's submission of the Policy Service Request Form was an offer, the court turns to the issue of whether ReliaStar accepted that offer prior to Baker's death

---

a face decrease.  Further, the language appears on a form intended for individuals who already held ReliaStar insurance policies, and therefore had already been found eligible for insurance coverage.  Indeed, ReliaStar itself acknowledges that it "had already determined that [Baker] was eligible for coverage back in December of 2010, when it agreed to insure him."  (*Id.* at 4.)

on December 16, 2012. This question is a close one. The timing here is key, as "a beneficiary's right to insurance proceeds vests on the date of the insured's death. A later modification, even one which is retroactive, can have no effect on a beneficiary's claim to benefits." *Filipowicz v. Am. Stores Benefit Plans Comm.*, 56 F.3d 807, 815 (7th Cir. 1995) (citations omitted).

ReliaStar contends that it accepted Vestor's offer to decrease the Policy face amount on or before December 15, 2012, when Cognizant employee Heather Phelps conducted a "good order review" of the request, confirmed that it satisfied ReliaStar's criteria for face decreases, drafted a confirmation letter, and put the decrease into Defendant's administrative server system. (Def. Mem. at 19.) VCM argues that ReliaStar did not accept Vestor's offer to decrease the amount of the Policy until December 18, 2012, when ING employee and Phelps's supervisor, Brandi Barnard, reviewed the Policy Service Request Form and stamped it with the signature of ReliaStar officer Laurie Rasamen. (Pl. Mem. at 13.)

In ReliaStar's view, acceptance of Plaintiff's offer was essentially automated and occurred long before December 16, 2012: "When VCM sent in the Form for the face decrease, ReliaStar had already consented to it because it fit squarely within ReliaStar's allowed criteria for face decreases." (Def.'s Resp. at 13; *see also* Def. Reply at 13 (arguing that ReliaStar "waived [the] requirement . . . that an officer sign the [Policy Service Request Form] before the face decrease [could become] be effective.").) Those criteria are that "[t]he new face amount was more than $100,000, there had been no prior face decreases, the Policy had been in force for over a year, and the Policy was in active status (not in grace due to unpaid premium) when Plaintiff sent in the Form and when ReliaStar processed the decrease." (Def.'s Mem. at 19.) "Plaintiff *already knew* the face decrease was acceptable to ReliaStar," Defendant contends, because ReliaStar's "representatives told VCM's agent that a face decrease to $2 million would be 'perfectly fine' and was something that Plaintiff could 'certainly do.'" (*Id.* at 20-21.) As the court reads these assertions, however, they are essentially a back-door attempt to argue that

Vestor's submission of the Form was not an offer.[12]  As the court has explained, this position is inconsistent with the fact that some of ReliaStar's rules for accepting face decreases were internal guidelines unknown to Plaintiff.  And the assertion that the acceptance occurred before Baker's death ignores ReliaStar's procedures requiring (1) Phelps and Barnard to review the Form; and (2) Barnard to apply a signature stamp before any face decrease could be approved.

ReliaStar next argues that the timing of Barnard's signature was meaningless because ReliaStar "manifested its acceptance of Plaintiff's offer prior to Baker's death." (*Id.* at 20.)  As Defendant correctly notes, "[a]n offeree may manifest acceptance through a variety of channels, including conduct, words, a signature, or performance."  (*Id.* (citing *Operating Eng'rs v. Gustafson Const. Corp.*, 258 F.3d 645, 650 (7th Cir. 2001)).)  As ReliaStar sees things, it demonstrated its acceptance by completing the bulk of its processing by December 15, 2012. (*Id.*)  On this score, Defendant points to *Geary v. Great Atlantic & Pacific Tea Co.* for the proposition that "where a party accepts and adopts a written contract, even though it is not signed by him, he is deemed to have assented to its terms and conditions and is bound by them."  366 Ill. 625, 628, 10 N.E.2d 350, 351 (1937).  "That is exactly what happened here," ReliaStar claims, "even if Plaintiff were correct that its submission of the Form was an 'offer,' ReliaStar accepted and adopted same by entering the face decrease into its administrative system with the agreed upon effective date of December 15, 2012, and took all resulting steps consistent with that agreement."  (Mem. at 22.)

---

[12]  ReliaStar makes several arguments purportedly related to acceptance that are actually about the issue of which party made an offer.  In each instance, ReliaStar suggests that it "accepted" Vestor's offer before Vestor had even submitted the request form on November 27, 2012.  For instance, Defendant claims that its silence was sufficient to signal acceptance here because "the uncontroverted facts show that ReliaStar repeatedly confirmed to VCM that the decrease it wanted was acceptable. . . . VCM had no reason to expect that ReliaStar had to tell it, *again*, that the face decrease had been accepted."  (Def.'s Resp. at 26 (emphasis in original).)  ReliaStar similarly argues that its acceptance of Vestor's offer was implied because "VCM knew full well that the face decrease it wanted was acceptable to ReliaStar.  The material and uncontroverted facts before this Court show that ReliaStar told VCM repeatedly that the face decrease it wanted would be fine, was acceptable, and would be processed." (*Id.*)  Again, ReliaStar's "acceptance" came before Vestor ever made the offer by submitting the request.

But the holding in *Geary* does not support ReliaStar's conclusion. In that case, a landlord mailed two copies of a "renewal lease" to a tenant on February 25, 1931 and asked the tenant to "have both copies properly signed, and return[ed]." Tenant did just that on March 7 at approximately 10:30 a.m. Just three hour later, before the landlord received tenant's signed lease, the landlord wrote again, withdrawing the offer. Neither party was aware of the other's communication at the time they sent their respective letters on March 7. In a brief opinion, the Illinois Supreme Court held that "when an offer is made by letter and the offeree posts his acceptance, the contract is complete, notwithstanding a revocation or withdrawal of the offer is mailed before the letter of acceptance is received." *Geary*, 366 Ill. at 627-28, 10 N.E.2d at 351. Although the landlord had not signed the lease it mailed to the tenant, the court ruled that the parties' prior correspondence made clear that there was a

> negotiation instigated by [the landlord], a submission of an offer by it and with it a renewal lease on a form prepared by it. This can be construed to be but an offer to renew the lease. When the acceptance of that offer was mailed before receiving notice of an intention to withdraw the offer, the contract was closed.

*Geary*, 366 Ill. at 629, 10 N.E.2d at 352.

*Geary* is unhelpful for Defendant for at least two reasons. First, that case involved an *offeror* who failed to sign an offer that was later accepted by the *offeree*. The situation here is reversed. Perhaps more importantly, however, the offeree here (ReliaStar) posted its acceptance after Baker's death. Under the logic of *Geary*, the contract was not completed until then. *Geary*, 366 Ill. at 627-28, 10 N.E.2d at 351 ("[W]hen an offer is made by letter and the offeree posts his acceptance, the contract is complete.")

The principle that Defendant attributes to *Geary* actually originated in another case— *Ullsperger v. Meyer*, 217 Ill. 262, 75 N.E. 482 (1905)—with facts that are more germane here (an offeree failed to sign a contract but manifested its acceptance via its conduct). *Ullsperger* involved a disputed land sale. The buyer-offeree failed to sign the contract, but the Illinois Supreme Court held that the parties' agreement was binding because the seller-offeror had both

(1) signed the agreement and (2) accepted payments from the buyer consistent with the terms of the contract.  217 Ill. at 272, 75 N.E. at 486.  Responding to the argument that the contract should fail for lack of "mutuality," the Court concluded that "the [seller,] having signed the writing . . . , cannot defeat performance upon the ground of want of mutuality, based upon the fact, alone, that appellant, the [buyer], did not sign the same."  217 Ill. at 272, 75 N.E. at 486.

*Ullsperger* suggests that Defendant's actions before Baker's death fall short of valid acceptance.  The offeree in *Ullsperger* unambiguously and openly performed under the contract, clearly indicating its acceptance to the offeror.  ReliaStar's actions, meanwhile, were not known to Plaintiff, and from Vestor's perspective, Defendant's actions as of December 15 were just as indicative of rejection of the offer as they were of acceptance.

In arguing that its conduct constituted acceptance, ReliaStar faces another hurdle.  Under Illinois law, "[t]here is no acceptance . . . until the offeree notifies the offeror of the acceptance or at least employs reasonable diligence in attempting to do so."  *Sementa v. Tylman*, 230 Ill. App. 3d 701, 705, 595 N.E.2d 688, 692 (Ill. App. Ct. 2nd Dist. 1992) (citing Restatement (Second) of Contracts, § 56).  Defendant argues that it satisfied this standard prior to Baker's passing:

> ReliaStar acted with more than reasonable diligence under this standard. It processed the face decrease to ensure it was in effect in the AdminServer system on December 15, 2012. That same day, ReliaStar's representative generated its initial confirmation letter to Plaintiff. The only reason the remaining post-decrease processing could not be completed was because December 15, 2012 was a Saturday, not a business day.

(Def.'s Mem. at 23.)  But ReliaStar's argument misses the mark.  Internal operations unrelated to notifying Plaintiff (e.g., the policy's status on the AdminServer) are irrelevant to this analysis.  *See Martin v. Gov't Emps. Ins. Co.*, 206 Ill. App. 3d 1031, 1040, 565 N.E.2d 197, 202 (1st Dist. 1990) ("[I]nternal practices do not equate with an objective manifestation to Martin that GEICO had actually accepted his offer.  Objective manifestation is the essence of a valid acceptance." (internal citation omitted)); *cf. Geary*, 366 Ill. at 627-28, 10 N.E.2d at 351 ("[W]hen an offer is

made by letter and the offeree posts his acceptance, the contract is complete, notwithstanding a revocation or withdrawal of the offer is mailed before the letter of acceptance is received.").[13] Defendant's first objective manifestation of its acceptance was the letter it mailed to Vestor days after Baker died.

ReliaStar did not communicate acceptance of Plaintiff's offer by December 15. In *Sementa,* the offeree claimed that "he accepted the terms of the 'agreed order' by signing it on January 11, 1991," but "made no effort to notify Sementa of his 'acceptance' until March 28, 1991, long after he rejected the offer by making [a] counteroffer. Accordingly, there was no valid acceptance . . . ." *Sementa*, 230 Ill. App. 3d at 705-06, 595 N.E.2d at 692; *cf. United Leasing v. Commonwealth Land Title Agency*, 134 Ariz. 385, 389, 656 P.2d 1246, 1250 (Ct. App. 1982) (buyer's hand-delivery of acceptance to seller's agent was sufficient even though seller never received the notice). In this case, ReliaStar had completed most of its internal processing and generated its "initial confirmation letter" on December 15. It did not, however, make any effort to actually notify Plaintiff until after Baker's death.

ReliaStar emphasizes that December 15 was a non-business day, but the court sees less significance in this fact. Vestor submitted its offer on November 27, 2012, more than two weeks before December 15. ReliaStar has identified nothing other than its own procedures that prevented Phelps and Barnard from completing their review well before the policy's monthiversary, particularly if the review process was as *pro forma* as ReliaStar suggests.

---

[13] ReliaStar urges that *Martin* is inapplicable here because "[u]nlike the insurer in *Martin*, ReliaStar was not handling an application for insurance coverage, but an already approved request for a policy face decrease." This argument fails for two reasons. First, to the extent that it suggests that ReliaStar and not Vestor was the offeree, ReliaStar is mistaken for the reasons explained above. Second, the court is not convinced that Plaintiff's requested face decrease meaningfully differs from "an application for insurance coverage." In both instances, the insurer is faced with new contractual terms and has the discretion to accept or reject those terms. Both circumstances differ from a change in beneficiary, which a policy holder may change unilaterally. *See Sun Life Assurance Co. v. Williams*, 284 Ill. App. 222, 226-27, 1 N.E.2d 247, 248-49 (1936). Absent an agreement to the contrary, the existing relationship between the parties does not demand that the insurer accept the new terms. The existence of ReliaStar's review process for face decreases makes that clear.

Notably, ReliaStar did not complete processing of the Form on Monday, December 17, either. The facts here do not support the notion that the vagaries of the calendar were the only thing preventing ReliaStar from notifying Plaintiff of its acceptance.

The court concludes that Defendant failed to accept Vestor's offer prior to Baker's death, but recognizes that the result is somewhat troubling. It is undisputed that Plaintiff intended to decrease its policy face amount from $5 million to $2 million, effective December 15, 2012. That VCM should prevail, therefore, seems to fly in the face of the notion that courts aim to "give full effect to the intention of the parties" in contract disputes. *United States v. Rand Motors*, 305 F.3d 770, 774 (7th Cir. 2002). But any perceived inequity here is colored by hindsight bias. ReliaStar intended to accept Vestor's offer, but the only time that is relevant here is the period prior to Baker's death on December 16. And during that time, only one of the parties' intentions was clear. As Barnard's deposition testimony indicates, Vestor's proposed face decrease could still have been denied by ReliaStar as of December 18, when Barnard conducted her review.

The court also notes that, although the outcome here hinges, in part, on a formality, that formality is one established by ReliaStar. Common law rules regarding acceptance are intended, in part, to protect offerees like ReliaStar from being bound by terms to which they have not yet agreed. Contracting parties have a great deal of flexibility in determining what form of acceptance, if any, is required. Here, the procedures that postponed Defendant's acceptance were entirely of ReliaStar's own creation. Defendant could have drafted the Policy Service Request Form such that its notification was unnecessary. Restatement (Second) of Contracts, § 69. ReliaStar also could have allowed its contractors to process the Form prior to December 15. (*See* Feb. 3, 2016 Tr. at 47 ("[T]hey took all the steps they could up until that point to put it into effect. It can't go into effect until December 15th because that's one of the required procedures.")) It did neither. When Baker died, ReliaStar had not yet accepted Plaintiff's offer for a face decrease, and Vestor's $5 million policy remained in effect.

### III. ReliaStar's Affirmative Defenses

Finally, ReliaStar argues that it is entitled to summary judgment based on four affirmative defenses—waiver, estoppel, ratification, and breach of implied duty of good faith and fair dealing. (Def. Mem. at 24.) All four affirmative defenses stem from VCM's conduct following Baker's death, which, ReliaStar contends, precludes any further recovery from ReliaStar. ReliaStar has the burden of establishing each of these affirmative defenses. *Wasserman v. Autohaus on Edens, Inc.*, 202 Ill. App. 3d 229, 235, 559 N.E.2d 911, 916 (Ill. App. Ct. 1st Dist. 1990). The court concludes it has not met that burden.

#### A. Waiver

Under Illinois law, waiver is the "express or implied voluntary and intentional relinquishment of a known and existing right." *Solai & Cameron, Inc. v. Plainfield Cmty. Consol. Sch. Dist. No. 202*, 374 Ill. App. 3d 825, 845, 871 N.E.2d 944, 960 (Ill. App. Ct. 3d Dist. 2007) (internal quotations and citation omitted). ReliaStar argues that VCM voluntarily and intentionally waived its right to contest the Policy face decrease when it received two premium notices from ReliaStar for the $2 million Policy in December 2012 and January 2013 and thereafter failed to inform ReliaStar that the premium notices contained incorrect information.[14] (Def. Mem. at 26-27.) ReliaStar notes, further, that VCM did not reject the $173.96 refund that ReliaStar tendered to VCM after it received an excess premium payment from VCM on December 17, 2012. (*Id.* at 27.) As described above, on December 17, 2012, VCM paid $1,408.58, the monthly premium due under the $5 million Policy. (*Id.*) ReliaStar accepted

---

[14] ReliaStar also asserts that VCM waived its right to be paid under the $5 million Policy because it did not challenge the face decrease on a life insurance policy for a different Vestor officer, even though the face decrease for that policy was submitted, processed, and signed on the same day as Baker's face decrease. Unlike Baker, however, the other Vestor officer did not die. Thus, even though ReliaStar did not accept Vestor's offer to decrease the policy for the other Vestor officer until December 18, 2012, the effective date of December 15, 2012 applies to that policy. In any event, the court declines to find that VCM waived its rights under the Policy based on its actions in an unrelated contract. *See Gates v. Victor Fine Foods*, 54 F.3d 1457, 1466 (9th Cir. 1995), *cert. denied*, 516 U.S. 869 (1995) (refusing to expand waiver to encompass unrelated action).

$1,234.62 as payment for two months of premiums under a $2 million Policy and then issued a check to Vestor refunding the balance. (*Id.*) On January 2, 2013, VCM informed ReliaStar that it was returning the check to ReliaStar because it had been issued to Vestor, the former Policy owner, as opposed to VCM. In this letter, ReliaStar argues, VCM expressly accepted that the Policy was $2 million. (*Id.*)

VCM could have spoken up immediately, but the court disagrees that VCM waived its contractual right to receive payment under a $5 million policy by requesting that ReliaStar reissue the $173.96 premium refund. From the time of Baker's death, VCM never conceded that the face amount of the policy was $2 million in any of its communications with ReliaStar. Nor did VCM's conduct after Baker's death amount to an implied waiver, which, under Illinois law, "must be proved by a clear, unequivocal, and decisive act of the party who is alleged to have committed waiver." *In re Krueger*, 192 F.3d 733, 739 (7th Cir. 1999) (quoting *Ryder v. Bank of Hickory Hills*, 146 Ill.2d 98, 105, N.E.2d 46, 49 (1991)); *Whalen v. K-Mart Corp.*, 166 Ill. App. 3d 339, 343, 519 N.E.2d 991, 994 (Ill. App. Ct. 1st Dist. 1985) ("An implied waiver of a legal right [arises] when conduct of the person against whom waiver is asserted is inconsistent with any other intention than to waive it." (citing *Harrington v. Kay*, 136 Ill. App. 3d 561, 564, 483 N.E.2d 560, 563 (Ill. App. Ct. 1st Dist. 1985)). Prior to January 2, 2013, VCM had paid ReliaStar $1,408.58, the monthly premium for the $5 million policy. Then, not one week after requesting a reissuance of the $173.76 refund, VCM provided ReliaStar with a $400 check for payment of any balance due on the first month premium for the "Policy in the face amount of $5 million." *Cf. Wang v. Marcus Brush Co.*, 354 Ill. App. 3d 968, 970-71, 823 N.E.2d 140, 141-42 (Ill. App. Ct. 1st Dist. 2005) (plaintiff did not waive her right to possession of premises because she did not cash or deposit rent check sent by defendant).

### B.    Estoppel

Alternatively, ReliaStar argues, by writing the January 2, 2013 letter to ReliaStar and directing that the premium refund be reissued in VCM's name, VCM is estopped from now

claiming that ReliaStar owes it additional death benefits under the $5 million Policy. (Def. Mem. at 28.) Under Illinois law, "[t]he test used to evaluate an estoppel claim is whether, considering all the circumstances of the specific case, conscience and honest dealing require that a party be estopped." *Hubble v. O'Connor*, 291 Ill. App. 3d 974, 984-85, 684 N.E.2d 816, 824 (Ill. App. Ct. 1st Dist. 1997) (citing *Carey v. City of Rockford*, 134 Ill. App. 3d 217, 218, 480 N.E.2d 164, 165 (Ill. App. Ct. 2d Dist. 1985)). In *Hubble,* the Illinois appellate court set forth the elements a party is required to show in order to make out an estoppel claim:

> (1) voluntary words or conduct by the estopped party amounting to a misrepresentation or concealment of material facts; (2) actual or implied knowledge of the estopped party that the representations were not true; (3) lack of knowledge of the true facts by the innocent party both at time made or at time acted upon; (4) intent, or a reasonable expectation, on the part of the estopped party that the innocent party would act on the misrepresentations; (5) a reasonable, good-faith, detrimental change of position by the innocent party based on the misrepresentations; and (6) prejudice to the innocent party.

*Id.* 291 Ill. App. 3d 974, 684 N.E.2d at 825. ReliaStar's estoppel claim fails on the fifth of these elements. There is no evidence that ReliaStar detrimentally changed its position or was otherwise prejudiced as a result VCM's conduct. ReliaStar characterizes VCM's conduct as an attempt "to trick ReliaStar into accepting [higher] premium [payments]"—but there is no basis for the conclusion that such attempt at trickery was unsuccessful; ReliaStar at all times believed its obligation under the Policy was $2 million. (Def. Mem. at 30.) ReliaStar has not shown how it would have been better off, or would have acted differently, if VCM had expressly rejected the refund payment, rather than requesting that it be reissued in VCM's name. ReliaStar is understandably troubled by VCM's failure to notify it of Baker's death during the parties' numerous communications in December 2012 and January 2013. But this dispute about the effectiveness of the Policy decrease request would exist even if VCM had been fully forthcoming. Without a showing that it detrimentally relied on VCM's conduct, ReliaStar cannot establish estoppel.

## C.    Ratification

Next, ReliaStar asserts that these same actions—VCM's request to reissue a refund in VCM's name, and VCM's failure to object ReliaStar's premium calculations based on the $2 million policy—amounted to a ratification of the parties' agreement to decrease the face amount of the Policy.  (Def. Mem. at 29.)  Under Illinois law, only "a voidable contract can be ratified." *Ill. State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co.*, 355 Ill. App. 3d 156, 164, 821 N.E.2d 706, 713 (Ill. App. Ct. 1st Dist. 2004) (internal quotations and citations omitted); *see also* 17A AM. JUR. 2D, CONTRACTS § 7 (1964 & Supp. 1990) ("[A] voidable contract . . . is valid and binding until it is avoided by the party entitled to avoid it.").  In this case, Baker's death fixed Vestor's rights to receive proceeds under the original $5 million Policy and terminated ReliaStar's ability to accept Vestor's offer to decrease the face amount.  Thus, Vestor asserts, there was no agreement to modify the Policy, voidable or otherwise, and nothing for VCM to ratify.

Nor does it appear that VCM's conduct amounts to ratification.  Under Illinois law, "[r]atification occurs when 'the party to be charged with ratification clearly evinces an intent to abide and be bound by [the agreement]." *Anderson v. Rizza Chevrolet, Inc.*, 9 F. Supp. 2d 908, 912 (N.D. Ill. 1998) (quoting *Hofferkamp v. Brehm*, 273 Ill. App. 3d 263, 273, 652 N.E.2d 1381, 1389 (Ill. App. Ct. 4th Dist. 1995)).  "Ratification may be inferred from surrounding circumstances, including long-term acquiescence, after notice, to the benefits of the allegedly unauthorized transaction." *Stathis v. Geldermann, Inc.*, 295 Ill. App. 3d 844, 858, 692 N.E.2d 798, 819 (Ill. App. Ct. 1st Dist. 1998).  Ratification will not be implied, however, "from acts or conduct which are as consistent with an intention not to ratify as to ratify."  VCM's request for a premium refund appears inconsistent with its position that the face decrease never became effective; but prior to requesting a refund, VCM had paid the full premium due under $5 million Policy.  The court notes, further, that at the time VCM requested the refund, ReliaStar had advised it (inaccurately, as it turned out) that the face decrease had been completed before Baker died.  Approximately one week after the refund request, moreover, VCM provided

ReliaStar with a $400 payment and stated that this payment was for any balance due under the original $5 million Policy. And one month after that, VCM informed ReliaStar that it expected to receive a death benefit under the $5 million Policy. Taken together, VCM's actions were as consistent with an intention not to ratify as to ratify, and they do not evince a clear intent to be bound by the Policy face decrease.

## D. Breach of Implied Good Faith and Fair Dealing

Lastly, ReliaStar argues that VCM's conduct following Baker's death constitutes a breach of the duty of good faith and fair dealing and precludes recovery from ReliaStar. (Def. Mem. at 30.) Specifically, ReliaStar contends that VCM acted in bad faith when, despite multiple communications between ReliaStar and VCM in December 2012 and January 2013, ReliaStar waited until February 2013 to inform ReliaStar that Baker had died. (*Id.*) VCM also acted in bad faith, ReliaStar asserts, by sending ReliaStar premium payments based on the $5 million Policy, knowing that ReliaStar believed that the parties had reduced the face amount of the Policy to $2 million. (*Id.*)

"The duty of good faith and fair dealing is implied in every contract and requires a party vested with contractual discretion to exercise it reasonably, and not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of parties." *Seip v. Rogers Raw Materials Fund, L.P.*, 408 Ill. App. 3d 434, 443, 948 N.E.2d 628, 637 (Ill. App. Ct. 1st Dist. 2011) (citing *Kirkpatrick v. Strosberg*, 385 Ill. App. 3d 119, 131, 894 N.E.2d 781, 793 (Ill. App. Ct. 2d Dist. 2008)). The duty is not an independent source of duties for the parties to a contract, and is merely "used as a construction aid in determining the intent of the parties where an instrument is susceptible of two conflicting constructions." *Id.* (citing *Fox v. Heimann*, 375 Ill. App. 3d 35, 42, 872 N.E.2d 126, 134 (Ill. App. Ct. 1st Dist. 2007) (internal quotations omitted)); *see also Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 395 (7th Cir. 2003) ("Illinois courts use the covenant [of good faith and fair dealing] to determine the intent of the parties where a contract is susceptible to two conflicting constructions."). Here, ReliaStar's good faith and fair

dealing defense is not related to ambiguities in the language of the Policy.  Rather, ReliaStar asserts that VCM had an independent duty to act in good faith solely based on the fact that a contract existed between the parties.  Such an independent duty of good faith and fair dealing does not appear to exist under Illinois law.  *See Spadoni v. United Airlines, Inc.*, 2015 IL App. (1st) 150458, 47 N.E.3d 1152, 1165 (Ill. App. Ct. 1st Dist. 2015) ("Illinois law does not recognize an independent cause of action for breach of an implied duty of good faith and fair dealing in a contract.")

Further, the court is not persuaded that VCM's failure to disclose Baker's death promptly constitutes bad faith.  VCM was under no legal obligation to inform ReliaStar of Baker's death before it did so in February 2013.  ReliaStar has not suggested how VCM's informing it of Baker's death immediately would have changed the outcome of this case.  The parties' post hoc communications have no obvious bearing on the court's findings that Baker's death occurred prior to ReliaStar's acceptance of Vestor's offer to decrease the amount of the Policy and that Vestor's right to receive proceeds under the Policy became fixed on the date of Baker's death. With respect to ReliaStar's assertion that VCM acted in bad faith when it provided ReliaStar with premium payments for the $5 million Policy, ReliaStar does not contend that VCM's actions amounted to fraudulent misrepresentation.  And any such suggestion would fail because ReliaStar has not alleged that it suffered injury as a result of its reliance on VCM's conduct.  *See Cangemi v. Adv. South Sub. Hosp.*, 364 Ill. App. 3d 446, 468, 845 N.E.2d 792, 812 (Ill. App. Ct. 1st Dist. 2006) (holding that fraudulent misrepresentation requires that "reliance by the person to whom the statement was made led to . . . injury." (quoting *Stewart v. Thrasher*, 242 Ill. App. 3d 10, 15-16, 610 N.E.2d 799, 803 (Ill. App. Ct. 4th Dist. 1993))).

## CONCLUSION

VCM's motion for summary judgment [91] is granted. ReliaStar's motion for summary judgment [94] is denied. VCM's motion to strike the declarations of John Baker and William McNulty [105] is also denied.

ENTER:

_____

Dated: July 18, 2016

REBECCA R. PALLMEYER
United States District Judge